UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

JAMES P. LAICH,                          Case Number:  08-20089

                                        Honorable Julian Abele Cook, Jr.
        Defendant.

## ORDER

The Government has accused the Defendant, James P. Laich, of possessing material which contained images of child pornography and transporting those images in interstate commerce, in violation of 18 U.S.C. §§ 2256 and 2252.  On March 19, 2009, Laich filed a motion to suppress, in which he argues that the evidence of alleged child pornography had been wrongfully removed from the laptop computer by agents of the federal government in violation of the Fourth Amendment.   Thereafter, the Court conducted a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978) in an effort to determine the veracity of the allegations that had been proffered in an affidavit by Special Agent Adel Buloushi of the Immigration and Customs Enforcement (ICE) to a magistrate judge in support of his request for the search warrant which has now been challenged by Laich.

## I.

Ronald Mancos, a resident of Melvindale, Michigan, complained to his local police department that he had received two images of child pornography while chatting online during the

early morning hours of February 13, 2005.[1]  Mancos advised the interviewing police officers that

the person with whom he had been chatting utilized a Yahoo! profile name of "playthangnyc18."

Four days later, this information was conveyed to Immigration and Customs Enforcement (ICE)

agents who subsequently determined that the screen name playthangnyc18 was registered to Laich.

An interview of Mancos by ICE agents followed.  After Mancos consented to a  forensic search of

his computer, the ICE agents retrieved a total of eight child pornographic images from heretofore

"unallocated space"[2] on its hard drive.   The images were not attached to any email and were not

found to be connected playthangnyc18 or Laich.  According to the agents, only four of the eight

images were the same as those Mancos had reported to the ICE agents.[3]  Buloushi, who had been

authorized by Mancos to search his email account, found no evidence of child pornography after

personally examining approximately 750 messages.

   Thereafter, the ICE agents placed Laich on a Treasury Enforcement Communications

System (TECS) "lookout" list which is maintained by the United States Customs and Border

Protection (CBP) on behalf of the United States Department of Treasury.  On or about April 1,

2005, CBP officers intercepted Laich and temporarily detained him upon his arrival on an

international flight at the San Francisco International Airport.  They, after examining his laptop

computer, released him when their search revealed no incriminating evidence.

_____

   [1]During this interview, it became apparent to the Melvindale law enforcement officers
that Mancos believed the person with whom he had been chatting was Jennie Donovan, a 24
year-old woman.  This fact was not disclosed by Buloushi in his affidavit.

   [2]The term,"unallocated space," is defined by the Court for the purpose of this order as
available disk space that is not allocated to any volume.

   [3]The parties agree that the four additional images appeared to be young males, all of
whom were naked and whose ages remain undetermined.  These remaining four images were not
mentioned by Buloushi in his affidavit.

2

Five days later, ICE agents contacted and interviewed Cheri Wilson, the manager of the condominium complex where Laich lived in Novi, Michigan.  During this interview, they were told by her that Laich (1) maintained a desktop computer in his home[4] and (2) spent time alone with a 12 year-old male relative.  ICE agents independently confirmed that Laich had internet access at his Novi home.[5]  They also learned that in the middle of February of 2005, Laich admitted to the Novi police that he had posed online as a woman who sought the attention of a male[6] to have sex with "her" fictitious five year old daughter.  Although Laich was out of state at the time, he gave the male with whom he was chatting his Novi address and phone number.

On April 10, 2005, CBP officers detained  Laich  and his baggage upon his arrival at the Dallas - Fort Worth International Airport on a flight from Mexico.  However, when the officers did not find any incriminating evidence after searching his luggage, they permitted him to proceed to his connecting flight.  When the CBP agents contacted Buloushi to provide him with an updated address for Laich, they - after being informed about the pending investigation in Michigan - were asked by him to seize the laptop in Laich's possession.  Acting upon Buloushi's request, Laich was escorted back to the customs inspection area where he was detained for approximately one and one half hours.  Although Laich was allowed to leave the detention area after the ninety minute span, his camera and laptop were permanently retained by the CBP officers.  Rather than to continue their search of Laich or his computer or camera on-site, however, the CBP officers elected to deliver the

---

[4]The manager, who had regular access to Laich's  home as a friend and an occasional caretaker for his cats when he was out of town,  reasserted to ICE agents during a subsequent phone interview on May 3, 2005 that Laich continued to maintain a computer at his home. .

[5]The manager verified that Laich - in submitting his application for a residence at the Novi condominium complex - had identified Waterford, Michigan as his prior home address.

[6]Buloushi identified the male with whom Laich allegedly spoke as Andrew Vinyard.

3

items to Buloushi in Detroit through Federal Express.  Upon his receipt of Laich's equipment, Buloushi gave the items to Special Agent Michael MacBride for a more extensive search. Acting without the authority of a search warrant, MacBride forensically searched Laich's laptop, and found approximately five child pornography images in allocated space, one child pornography image in unallocated space, three child pornography images in the recycle bin and two child pornography movies which contained 150 images.

Buloushi prepared an affidavit which bore the date of June 14, 2005 in which he appears to have relied heavily on the evidence that was discovered during the forensic search of Laich's computer as the basis for seeking the now-contested search warrant. Relying upon the accuracy of the affidavit, the magistrate judge authorized Buloushi's request which was  executed on June 15, 2005. As a result, the agents seized the following items for forensic examination:  (1) a Toshiba laptop computer; (2) a Dell Dimension desktop computer with two hard drives; and (3) several electronic storage media devices.[7]  A forensic examination of these devices revealed more than 1000 images of child pornography and 22 movies involving the same content.

According to the Government, Laich - after receiving *Miranda* warnings - voluntarily acknowledged that he (1) is the owner of the playthangnyc18 screen name, (2) transmitted four images of child pornography to an individual in Melvindale, Michigan, and (3) had downloaded

---

[7]The Government contends that immediately following this search, Laich gave written consent for the agents to search his computer and electronic equipment. It appears that he also gave consent to a complete search of his email accounts through Yahoo! and America Online for email messages / message content, and digital information. However, it should be noted that an unidentified person specifically crossed out the wording on the form which would have given consent to search all computer / electronic equipment (including internal hard drive(s), floppy diskettes, CDs, DVDs, and other electronic storage devices).

4

child pornographic images from various websites which, in turn, were forwarded to other users in the internet chat rooms.

## II.

The Fourth Amendment to the United States Constitution, in protecting the right of the people to be free from unreasonable searches and seizures, reads:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In 1985, the Supreme Court opined that a judicial determination of reasonableness is dependent upon the nature of the search or seizure, as well as all of the surrounding circumstances. *U.S. v. Montoya de Hernandez,* 473 U.S. 531, 537 (1985).

A.     The Seizure of Laich's Laptop Computer and Subsequent Forensic Search

The Supreme Court has long recognized that the Government has plenary authority to conduct warrantless border searches, even without probable cause or reasonable suspicion. *Id.* at 537-38. The Court has characterized such searches as *per se* reasonable, *U.S. v. Ramsey*, 431 U.S. 606, 616 (1977), in light of the Government's need to "regulate the collection of duties and to prevent the introduction of contraband into this country." *Montoya de Hernandez* at 537.

When - as here - a customs official detains a person after the initial border search has been completed, the Court of Appeals for the Sixth Circuit (Sixth Circuit) has suggested that a different analysis is required. In an unpublished decision in *U.S. v. McGinnis*, 247 Fed. Appx. 589, 594 (6th Cir. 2007), the court adopted for the first time what other jurisdictions have called the "extended border search doctrine." Rather than limiting border agents to the ability to conduct a search only if they have probable cause, this doctrine permits them to proceed with reasonable suspicion, "in

5

recognition of the 'many difficulties that attend' customs officials' 'attempt[s] to intercept contraband and to apprehend increasingly mobile and sophisticated smugglers." *Id.* (modification in original).

The *McGinnis* court set forth a three-part inquiry that other circuits have used in deciding whether to uphold an extended border search. This analysis includes an assessment of whether (1) the person crossed the border, (2) the law enforcement officer seized the person and his luggage "sufficiently soon after the crossing to be reasonably confident that the condition of the individual and [his] luggage did not change after the border crossing," and (3) the agent had a reasonable suspicion that the person violated a criminal law. *Id.* According to *McGinnis*, a court should pay "special attention to whether the suspected criminal activity relates to a recent border crossing . . . ." *Id.*

As to the third *McGinnis* factor, the reasonable suspicion inquiry is analogous to the requirements for a *Terry* stop. *U.S. v. Yang*, 286 F.3d 940, 949 (7th Cir. 2002) (citing *Terry v. Ohio*, 392 U.S. 1 (1983)). Under *Terry*, a warrantless detention or a luggage search is permissible where there is reasonable suspicion that criminal activity is afoot. 392 U.S. at 30. Reasonable suspicion must be based on "specific and articulable facts," which - when taken together with rational inferences under the existing circumstances - reasonably warrant the intrusion. *Id* at 21. Any search or detention that flows from a *Terry* stop must be reasonably related in scope to the circumstances which justified the initial interference. *Id.* at 20.

Here, Laich appears to concede that the Government's initial detention and search of his laptop at the Dallas - Fort Worth Airport falls within the border exception. Nevertheless, he argues

6

that when that search bore no incriminating evidence, there was no legal exigency to support a second detention or the permanent seizure of his laptop.

In its response, the Government makes two points. First, it highlights Laich's placement on a TECS lookout list when he traveled throughout the airport. This factor is unpersuasive, in that the Government has not provided the Court with any insight into the overall nature of the TECS list, the standards, if any, that were used to determine an individual's placement on this list, or the significance, if any, of being designated as one for whom officials should "lookout."

Second, the Government relies heavily upon the evidence that Buloushi told the Dallas CBP officers that Laich was the subject of a child pornography investigation in Michigan. Generally speaking, such information could arguably qualify as a "specific and articulable fact" that would ordinarily justify an officer in reasonably suspecting that a person had committed a criminal act. However, these facts alone do not support an inference that Laich's suspected criminal activity had any reasonable relationship to his recent border crossing. *See e.g., McGinnis* at 596 (customs official had reasonable suspicion to suspect defendant of smuggling currency across borders of United States); *Yang, supra* at 948 (airport officials reasonably suspected defendant of smuggling drugs into United States from Laos); *U.S. v. Cardenas,* 9 F.3d 1139, 1153-54 (5th Cir. 1993) (upholding extended border search where defendant was suspected of smuggling cocaine into United States from Mexico); *U.S. v. Caicedo-Guarnizo*, 723 F.2d 1420, 1422 (9th Cir. 1984) (reasonable suspicion to support extended border search where officers believed defendant satisfied profile of internal ingestion drug smuggler).

In the case before this Court, Laich's suspected crime was rooted in events that presumably had occurred several months prior to his arrival at the airport. Significantly, the Government does

7

not argue that his international travels were in furtherance of the alleged offense. Inasmuch as the extended border search doctrine was designed to aid in the protection of the borders of the United States, it cannot be casually transformed into a tool for general crime prevention. Because there is no showing that Laich was reasonably suspected of criminal activity related to his border crossing, the Government cannot justify its seizure of Laich's laptop as part of an extended border search.

Even if the Court deemed this detention to be a valid exercise of the Government's police powers, there was no legal basis to support the permanent seizure of Laich's laptop computer. When the CBP officers directed Laich to return to the inspection area, they did not conduct an additional search of his laptop. Rather, they detained him and retained his computer for approximately ninety minutes[8] and, thereafter, mailed the seized property to Buloushi in Detroit. Although the decision by the Supreme Court in *United States v. Place*, 462 U.S. 696,701-707 (1983) may have provided the officers with the legal authority to briefly seize Laich's laptop to investigate the circumstances which aroused their reasonable suspicion of a criminal wrongdoing, such an investigative detention was not properly limited in its scope here. In the absence of a demonstrated probable cause, the Government's decision to permanently seize Laich's property in Dallas and transport it hundreds of miles to another jurisdiction for further search was unreasonable by Fourth Amendment standards.

---

[8]The Government is correct in noting that the length of Laich's detention alone does not offend Fourth Amendment principles. *See generally, Montoya de Hernandez*, 473 U.S. at 543 (Supreme Court has rejected hard and fast time limits in this regard). However, the inquiry does not end there. As noted above, any investigative detention must be properly limited in scope, and the decision to permanently seize Laich's computer, without more, exceeded the permissible limits of the original detention.

Furthermore, there has been no proffered evidence from the Government that would justify the subsequent warrantless forensic examination of Laich's computer.  Inasmuch as the laptop was Laich's personal property, he had a reasonable expectation of privacy in the computer and its contents. *See, e.g. U.S. v. Calandrella*, 605 F.2d 236, 251 (6th Cr. 1979) (recognizing defendant's privacy interest in his briefcase, as its very purpose is to "transport papers and other items of an inherently personal, private nature.").  Although there may be situations in which law enforcement officers may seize the personal property of an individual and hold it until a search warrant is obtained, *California v. Acevedo*, 500 U.S. 565, 575 (1991), no such effort was undertaken here.[9] Furthermore, the Government has not pointed to any exigency or other circumstance that would justify the Court in making an exception to the general rule that searches must be conducted only with prior approval by a judge or magistrate.

Accordingly, the Court finds that the forensic search of Laich's laptop computer violated his rights under the Fourth Amendment, and any evidence which was obtained as a result of this search must be stricken from the search warrant and suppressed from evidence.

B.      The Validity of the Warrant to Search Laich's Home

An officer who seeks to obtain a search warrant must produce adequate supporting facts about the circumstances to show that probable cause exists to support the requested search.  *U.S. v. Hodson,* 543 F.3d 286, 293-94 (6th Cir. 2008).  Probable cause to search a location exists if "there is a fair probability that contraband or evidence of a crime will be found in a particular place."

---

[9]The Court rejects the Government's suggestion that Buloushi relied in good faith on the advice from an Assistant United States Attorney that no warrant was necessary to conduct the forensic search since it was done pursuant to the extended border search doctrine.  The right to be free from extensive searches and seizures like the one at issue here should be well known to any reasonable law enforcement officer.

*Illinois v. Gates,* 462 U.S. 213, 238 (1983). Furthermore, "the duty of a reviewing court is simply to ensure that the magistrate [judge] had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Id.*

The Government argues that even if the Court suppresses the contested information from Laich's laptop, the combination of the following factors have established a cognizable probable cause upon which the challenged search could be justified; namely, (1) Laich's connection to the playthangnyc18 email account along with his alleged email transmission of four child pornographic images, which the Government maintains was confirmed through a forensic examination of Mancos' computer; (2) the ongoing actions by Laich in posing as a female who sought a male to have sex with "her" fictitious five-year old daughter, coupled with a decision to give his home address during these chats about the minor; (3) the opinion by Buloushi that collectors of child pornography often keep copies of child pornographic materials in their computers at home; and (4) Laich's decision to keep a computer in his home with internet access. The Government also submits that the Court should give great deference to the magistrate judge's decision which is to be overturned only if the judicial officer arbitrarily exercises her discretion in issuing the warrant. If all else fails, the Government argues that the warrant should be upheld under the good faith exception to the exclusionary rule.

Laich takes issue with this position by the Government, arguing that under rubric of *Franks v. Delaware, supra,* evidence obtained through a search warrant should be suppressed if the supporting affidavit contains materially false statements or omissions. A defendant is entitled to a *Franks* evidentiary hearing if he makes a "substantial preliminary showing" that (1) a search warrant affidavit contains false statements which were knowingly and intentionally made by the affiant or

10

with a reckless disregard for the truth; and (2) any such alleged false statements are necessary to the finding of probable cause. *Franks v. Delaware,* 438 U.S. 154, 156 (1978). If a defendant satisfies these two *Franks* prongs by a preponderance of the evidence during the hearing, a court must examine thereafter whether, with the false material in the affidavit set aside, the remaining content therein is sufficient to establish probable cause. *Id.* at 156. If the affidavit is deemed to be insufficient, "the search warrant must be voided and the fruits of the search excluded." *Id.* On the other hand, if the redacted affidavit provides the magistrate judge with a substantial basis for finding a fair probability that the subject contraband or the evidence of a crime would be found at the stated site, the Government has successfully established the existence of probable cause. *See Illinois v. Gates, supra; U.S. v. Mastromatteo*, 538 F.3d 535, 545 (6th Cir. 2008) (internal citations omitted). The Sixth Circuit has recognized that material omissions - in addition to any false statements - which were made deliberately or in a reckless disregard for the truth may also form the basis of a *Franks* challenge. Nevertheless, the court has held that an affidavit which omits potentially exculpatory information is less likely to raise an issue of impermissible police conduct than those cases which involve affirmative misrepresentations. *U.S. v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001). Omissions of information are viewed with more skepticism because such allegations could expose officers to "endless conjecture about investigative leads, fragments of information, or other matter that might, if included have redounded to the defendant's benefit." *Id.*

In articulating the *Franks* standard, the Supreme Court - while not defining the term "reckless disregard for the truth" - did emphasize, however, that mere negligence or an innocent mistake will not suffice. *Franks,* 438 U.S. 171. Moreover, the Court opined that when the Fourth

Amendment demands that the affiant provide a factual showing which will be sufficient to establish the existence of probable cause:

> the obvious assumption is that there will be a *truthful* showing. This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

*Id* at 164-65 (quoting *United States v. Halsey*, 257 F. Supp. 1002, 1005 (S.D.N.Y. 1966)). The Sixth Circuit has reasoned that an assertion is made with a reckless disregard for the truth when, "viewing all the evidence, the affiant . . . entertained serious doubts as to the truth of the statements." *U.S. v. Cican*, 63 Fed. Appx. 832, 837 (6th Cir. 2003). Because - as a subjective state of mind - recklessness must usually be proven circumstantially, a fact finder may infer reckless disregard for the truth from evidence that would give an officer "obvious reasons to doubt the veracity of the allegations" *Id.* (internal quotations omitted); *See also, Peet v. City of Detroit*, 502 F.3d 557, 571 at n.3 (6th Cir. 2007) (omissions are made with reckless disregard if the officer withholds facts that any reasonable person would have known is the kind of thing the judge would wish to know).

Here, Laich claims that several portions of Buloushi's affidavit are false. He initially highlights Buloushi's statements in paragraph 13 which reads that "On February 13, 2005, LAICH was logged into a Yahoo Instant Messenger chat room, chatting with MANCOS about sex." (Aff.¶ 13.) He submits that Buloushi knew that this statement was false because, in responding to two separate subpoena requests for subscriber information for "playthangnyc18" that had been prepared

12

by Buloushi's office, Yahoo! provided records[10] which demonstrated that Laich had not logged into his Yahoo! account under any of his screen names.[11]

In response, the Government points to subpoena returns provided by America Online (AOL) on April 29, 2005 which apparently show that Laich was online on February 13, 2005 by utilizing his screen name of "playthangnyc." This alternative login, the Government argues, would have given Laich access to his Yahoo! Instant Messenger account, which, in turn, enabled him to transmit pictures to Mancos as "playthangnyc18." On this point, the Government elicited testimony from Buloushi during the *Franks* hearing that - on the basis of his partner's conversations with Yahoo!'s legal department - he learned that this company does not record log-in activity or IP addresses for a person who uses Yahoo!'s Instant Messenger services. (T 69, 70). Rather, the Government notes that Yahoo! only captures log-in data from an individual's Yahoo! email account. *Id.* Furthermore, it is the position of the Government that, inasmuch as the subpoena results did not foreclose the possibility that Laich was utilizing Yahoo! Instant Messenger services on February 13, 2005 without being recorded, Buloushi deemed it unnecessary to disclose this information to the magistrate judge in the affidavit.

After carefully examining Laich's challenge, the Court notes that the only place in the affidavit in which Buloushi included a specific reference to log-in activity on a particular date was in the first sentence of paragraph 13. Contrary to the contention by the defense, Buloushi did not claim that Laich was logged on to Yahoo! email. Rather, he wrote that "[o]n February 13, 2005,

---

[10]The two responses from Yahoo! were dated February 18th and March 25th of 2005.

[11]The Yahoo! response also revealed that (1) Laich's login name was "IntlMan_99," and (2) the other identities / screen names used by him on their system included "playthangnyc18," "nycmalemodelsearch," "jen21finnyc," "adultvids4sale," and "lonelyinnyc001."

LAICH was logged into a Yahoo Instant Messenger chat room." (Aff.¶ 13.) When the Court considers Buloushi's explanation that the Yahoo! subpoena results only displayed login data for Laich's email accounts, it appears that paragraph 13 did not contain a false statement. Thus, the Court finds that Laich has not satisfied his preliminary burden under *Franks* as to this issue.

Even if Court accepted Laich's argument that Buloushi's statement in paragraph 13 was false, he has not shown that Buloushi made it intentionally or with a reckless disregard for the truth. To the contrary, Buloushi testified that - prior to submitting the affidavit to the magistrate judge - he reviewed the records from AOL which indicated that Laich was online through its service on February 13, 2005. While Laich correctly notes that the Court cannot consider this evidence from AOL for the purpose of assessing probable cause (since these records were never presented the magistrate judge), the records can shed some important light on Buloushi's state of mind when the affidavit was drafted by him. Thus, when the Court combines this fact with the information from Mancos that "playthangnyc18" was the individual who chatted with him online through Yahoo! on February 13, 2005, the Court concludes that Buloushi's statement did not reach the false or reckless disregard standard as required by *Franks,* in that the contested language was presumably "believed or appropriately accepted by the affiant as true." *Franks,* 438 U.S. at 164-65.

More troubling, however, are the statements within the warrant affidavit which attribute a non-existent email account to Laich, and repeatedly suggest that he "e-mailed" images of child pornography to Mancos during their alleged Instant Messenger chat session. Specifically, in paragraph 7, Buloushi wrote:

> 7.     The instant investigation has revealed that an individual employing the e-mail account playthangnyc18@yahoo.com, subsequently identified as James Paul LAICH has e-mailed four images of child pornography to MANCOS who was chatting with him in an internet chat room. There is probable cause to

14

believe that playthangnyc18@yahoo.com is using a computer that is located at the SUBJECT PREMISES. . . .

Similar statements appeared in three other places in the affidavit, including paragraph 12 (e.g. noting that "Ronald MANCOS had filed a report . . . advising that child pornography images were sent to him through Yahoo e-mail Instant Messenger . . . ."); the preamble to paragraph 33 (where Buloushi stated that "[Laich had] transmitted child pornographic images to MANCOS using Yahoo email."); and in paragraph 33(C)) (where Buloushi observed that "Laich . . . transmitted child pornographic images to MANCOS using Yahoo e-mail").  During the *Franks* hearing, Buloushi admitted that the above-referenced email address did not actually exist.  It was also acknowledged by Buloushi that, despite never having seen a playthangnyc18@yahoo.com email account which had been registered to Laich, he wrote otherwise in the affidavit.  (T 129-31).

In his advancement of this position, Laich points to three separate sources of information that would have or should have alerted Buloushi that his statements in paragraph 7 were false.  First, Laich notes that Buloushi knew that there were no email messages, attached illegal images or electronic communication of any kind found in Mancos' Yahoo email account. In support of his argument, Laich asserts that Buloushi had personally searched approximately 750 messages in Mancos' Yahoo! email account and "was [un]able to locate any material that resemble[d] child pornography."  (March 21, 2005 Report of Investigation at 3).  Buloushi confirmed this contention during the *Franks* hearing, and the Government conceded that Buloushi's personal search revealed no such contraband which was connected to Laich.

Second, Laich notes that a subsequent forensic search of Mancos' computer uncovered no evidence that e-mail messages containing child pornography were ever sent to or received by Mancos.  (March 17, 2005 Report of Investigation at 4-5).  Buloushi, in conceding this fact during

15

the *Franks* hearing, acknowledged that the forensic search showed that no-email to Mancos originated from Laich's Yahoo! Account.  Finally, Laich emphasizes that the results of the two Yahoo! subpoena requests indicate unequivocally that Laich did not use his Yahoo! email account on February 13, 2005.

In response to these contentions, the Government argues that Buloushi was simply mistaken or, at worse, was negligent in his preparation of the challenged affidavit.  Buloushi testified that he (1) considers himself "not very savvy" in terms of his level of familiarity with computers, and (2) was even less computer savvy when he drafted the affidavit than he was at the time of the hearing. (T 143)  Buloushi, in explaining this error, submits that Mancos had told him of his receipt of pornographic images through a Yahoo! Instant Messenger chat room.  (T 133-36). Thus, Buloushi submits that he was not surprised when the Yahoo! subpoena returns for Laich's email account showed no login activity on February 13, 2005.  (T 136-37).  Furthermore, Buloushi claims that he was unsurprised to find no pornographic images in Mancos' email account for the same reason.  (T 137).  As a result, Buloushi, who had concluded that Laich was the conveyor of the child pornography, felt it unnecessary to include these two results in his search warrant affidavit.

In considering the record before it, the Court finds Buloushi's explanations implausible.  As a preliminary matter, the Court rejects the notion that Buloushi knew very little about computers. In the preliminary portions of his affidavit, Buloushi avers that "[a]s part of [his training, [he has] become familiar with the Internet." (Aff. ¶ 8).  Moreover, he advanced more than five pages of technical terms and information relating to computers, computer technology, and the manner in which computers have revolutionized the use of child pornography over the years.  (Aff. ¶¶ 8-11).

In light of these sworn statements from Buloushi's own affidavit, the Court rejects his claim that he was not sophisticated with computers when he drafted the affidavit.

Moreover, it is undisputed that playthangnyc18@yahoo.com is a non-existent email account. Although it bears obvious similarity to a screen name which authorities later connected to Laich, it was plainly false for Buloushi to assert in paragraph 7 of his affidavit that (1) playthangnyc18@yahoo.com was an "email account" connected to an individual "subsequently identified" as the Defendant; and (2) "[t]here is probable cause to believe that playthangnyc18@yahoo.com is using a computer that is located at the SUBJECT PREMISES." Buloushi repeated his allegation that Laich had transmitted the child pornography pictures to Mancos through Yahoo! email in at least four different places in the affidavit (i.e. Aff. ¶¶ 7, 12, 33 and 33(C)).

The Court believes that viewed in the context of the entire affidavit, Buloushi materially misrepresented these key facts in a reckless disregard for the truth. The Court makes this finding in large part because Buloushi included a wealth of information in the affidavit which highlighted the particular importance of email to internet subscribers. Specifically, Buloushi averred that "[i]ndividuals . . . use the Internet . . . to send information to, and receive information from, other individuals; . . . [and] to communicate via electronic mail ("e-mail")," that "[a]n individual who wants to use Internet e-mail must first obtain an account with a computer that is linked to the Internet – for example, through a university, an employer, or a commercial service – which is called an "Internet Service Provider . . . ." and that "[o]nce the individual has accessed the Internet, that individual can use Internet mail services, including sending and receiving e-mail." (Aff. ¶ 8). He further noted that "[Internet Service Providers] provide a range of functions for their customers

17

including access to the Internet, web hosting, [and] e-mail," that "[m]any ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an "e-mail mailbox, and a personal password selected by the subscriber." (Aff. ¶ 9(d)). Finally, he described how many Internet Service Providers maintain records that may include subscriber and billing information, account access information "(often times in the form of log files)," and email communications on a temporary and a long term basis.

Then, after laying out an exhaustive array of information regarding computers, the internet and email communications, Bulloushi made direct assertions that Laich had transmitted the pictures to Mancos through Yahoo! email in four separate places in the affidavit (i.e. Aff. ¶¶ 7, 12, 33 and 33(C)). Given the omitted subpoena results from Yahoo!, which presumptively showed that Laich had never used his email account during the date in question, the Court concludes that Bulloushi had "obvious reasons to doubt the veracity of the allegations." *Cican* and *Peet, supra*.

This finding by the Court is buttressed by the evidence that Bulloushi and his partners had made repeated notations in at least four of their investigative reports about the pictures being sent "through a Yahoo e-mail account" or "through yahoo e-mail." It is possible, as Bulloushi testified, that each report reflected a cut-and-paste/boilerplate synopsis which replicated the same error. (T 105-06). However, the Court deems it significant that while Bulloushi purportedly "knew" that the images had been sent through Instant Messenger, he chose to search Mancos' computer for evidence of child pornography in Mancos' *email* account, and not his Instant Messenger logs. (T 108). Similarly, the Court notes that in requesting records from Yahoo! and AOL to corroborate Mancos' story, Bulloushi sent subpoena requests that specifically sought information related to Laich's *email*

18

accounts. Based on the evidence, the Court finds that Buloushi made the references to email with a reckless disregard for the truth.

In addition to the foregoing, Laich takes exception to a statement by Buloushi in the last sentence of paragraph 12 of his affidavit which states that "[the] screen name 'playthangnyc18' is registered to James LAICH of Novi, Michigan." (Aff. ¶ 12). To support his contention, Laich notes that the account associated with "playthangnyc18" was actually registered to his former address in Waterford, Michigan. The Government correctly notes, however, that Buloushi was forthcoming in his affidavit about this discrepancy. In paragraph 33(D) of the affidavit, Buloushi stated that Laich had listed his Waterford address when he registered his Yahoo! account. More importantly, Buloushi noted that Laich - when applying for residence at his current Novi address (which was the subject of the search) - identified the Waterford location as his previous home. In light of this evidence, it is clear that Laich has not met his burden of showing that Buloushi made a false statement as contemplated by *Franks*.

Finally, Laich contends that Buloushi intentionally omitted information that would have given the magistrate judge a basis upon which to doubt Mancos' credibility. He also argues that Buloushi had a duty to disclose certain material information to the magistrate judge in his affidavit; to wit, (1) the change in Mancos' story about the number of images of child pornography that were received by him (from two to four); (2) a subsequent forensic examination of Mancos' computer which actually revealed eight images; (3) inasmuch as the law enforcement authorities were suspicious about the accuracy of Mancos' story, they interrogated him in their office after providing him with *Miranda* warnings; and (4) that it was the view of the investigating officers that Mancos' explanation for not disclosing the other four images of child pornography was "curious" and

19

consistent with guilty persons who blame other persons for criminal activity.[12]  In response to these claims, the Government elicited testimony from Buloushi who explained that he did not mention the other four images on Mancos' computer because it was deemed by him to be irrelevant to the Laich investigation.  (T 140).  Furthermore, Buloushi testified that he believed that the inclusion of the additional pictures would have misled the magistrate judge about Laich's culpability for these images.  Most importantly, Buloushi explained that although Mancos did act suspiciously with regard to the pictures of the young boys, it was his belief that Mancos was being truthful about receiving the four pornographic images from playthangnyc18, a person whom he did not know.

After reviewing the record on this point, the Court finds that the evidence does not support Laich's contention.  As a named informant, Mancos could be held accountable for providing the Government with false information.  Arguably, this fact alone could have bolstered his credibility with the magistrate judge.  *See., e.g. U.S. v. Couch*, 367 F.3d 557, 560-61 (6th Cir. 2004).  Moreover, the Sixth Circuit has held that witnesses like Mancos who experience crime firsthand are presumed reliable unless there is an apparent reason for the officer to believe that the person was lying or mistaken.  *See e.g. U.S. v. Harness,* 453 F.3d 752, 754 (6th Cir. 2005) (applying this principle to eyewitnesses); *Illinois v. Gates, supra* at 233-34 (observing that even if a Court "entertain[s] some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case.").  Accordingly, the Court does not view the information

---

[12]According to Buloushi's police report on this subject, Mancos claimed that he had never seen the four images of the pubescent naked males prior to his receipt of the pictures from playthangnyc18.  Mancos also indicated that he lives with his father and had previously lived with two former girlfriends, all of whom had access to his computer.  (April 5, 2005 Report of Investigation at 3-4).

conveyed by Mancos' with the same skepticism as it would apply to "an uncorroborated tip of an unknown informant." *Couch,* 367 F.3d at 560.  And while it is true that some of Buloushi's alleged omissions would have undermined Mancos' credibility, the Government correctly notes that other information - namely, the presence of additional child pornographic images - may have unfairly *contributed* to a finding of probable cause against Laich.  Thus, the Court cannot conclude that Buloushi excluded this information from the affidavit with an intent to mislead the magistrate judge. Hence, Laich's challenge to this material under the *Franks* criteria must be rejected.

The final task of the Court under the *Franks* analysis is to determine whether, with the false statements eliminated from the affidavit, and the omitted information included, there remains probable cause to search Laich's home.  *Franks,* 438 U.S. at 155-56.  As noted above, probable cause exists when there is a fair probability - given the totality of the circumstances - that contraband or evidence of a crime will be found in a particular place.  *Illinois v. Gates, supra*.

In arguing that the remaining averments in the affidavit would not establish probable cause or a sufficient nexus to search his home, Laich presumably asks the Court to strike all of Buloushi's statements pertaining to Mancos.  (Def's *Frank's* Mot. to Suppress at 17). However, the Court believes that granting this request would cut too broad of a swath.  *See, e.g., U.S. v. Wright,* 131 Fed. Appx. 471, 475 (6th Cir. 2005) (authorizing redaction of only false portions of an affiant's misstatements, and noting that "while the government should not profit from its illegal activity, neither should it be placed in a worse position than it otherwise would have occupied.").  While it can be argued that Buloushi recklessly made false statements about the *manner* in which the illegal images were transmitted, Laich posed no credible challenge to Mancos' attestation that the alleged child pornographic pictures had been received by him - regardless of their delivery method. Thus,

21

the Court believes that it would be inappropriate to strike the portions of paragraphs 12, 13 and 33 which reflect Mancos' allegation that these pornographic images were sent to him by playthangnyc18.

If the Court strikes (1) all of the references to evidence that was seized during the search of Laich's laptop, (2) all false statements (in paragraph 7 and elsewhere) that the child pornography was transmitted by email and/or through playthangnyc18@yahoo.com, and (3) the language in paragraph 34 (relating to the habits of "collectors of child pornography" which the Government concedes has no foundational nexus to Laich), the affidavit contains the following relevant allegations:

12. On February 17, 2005, ICE SAC/Detroit received information from the Melvindale Michigan Police Department (MPD) in regard to a complaint of child pornography being sent via the Internet. The Melvindale Police Department advised that Ronald MANCOS had filed a report with their Department advising that child pornography images were sent to him . . . by an individual using the screen name "playthangnyc18". It has been determined that [sic] screen name "playthangnyc18" is registered to James LAICH of Novi, Michigan.

13. On February 13, 2005, LAICH was logged into a Yahoo Instant Messenger chat room, chatting with MANCOS about sex. During the chat session, LAICH asked MANCOS if he could see MANCO'S penis on the web camera. MANCOS stated he transmitted an image of his penis using his web camera, saying that he did not have an erection. LAICH reportedly responded by sending four images of what appears to be a naked prepubescent female, lying on a bed with an adult male standing over her with his penis being forced in her mouth. The third and forth [sic] images depict the adult male ejaculating on the pubescent naked female 's [sic] face and in her mouth. LAICH reportedly sent the aforementioned images to MANCOS in order for MANCOS to get an erection by looking at them. MANCOS stated that upon receiving the images, he immediately terminated the chat with LAICH.

14. On March 2, 2005 Special Agents Adel Buloushi and David Dominique, and Melvindale Police Department Detective Sergeant Chad Hayse contacted Ronald MANCOS regarding his complaint. MANCOS relayed the above information to agents, and consented for agents to take his computer to ICE SAC/Detroit for a forensic examination in order to retrieve the child pornography images sent to him by Laich.

15.     On March 8, 2005, ICE SAC/Detroit Special Agent/Computer Forensics Agent Michael Macbride retrieved four child pornography images from MANCOS' computer hard drive.  The images were found as the result of the forensic examination . . . . The four images appeared to be the same images in Paragraph 13 above. . . .

        . . . .

19.     SA Buloushi asked WILSON [the manager of the Defendant's condominium complex] if she noticed LAICH behaving in any suspicious way.  WILSON told SA Buloushi that approximately one or two months ago, she received a call from LAICH, while he was out of town . . . . LAICH told WILSON that while he was in West Virginia on business travel, in the middle of February of 2005, he was staying in a hotel.  LAICH went on [sic] a Yahoo chat room and began chatting with another male.  LAICH was posing as a young female while he was chatting with the male.  WILSON asked LAICH why he posed as a female.  LAICH told WILSON because "he likes to get images back from young males".  LAICH further stated to WILSON that "[h]e would not do any thing like that to little boys, because I have KEANN who spends some nights with me". . . .

        . . . .

22.     On April 7, 2005, Special Agents Adel Buloushi and David Dominique obtained a police report from the Novi, Michigan Police Department . . . indicating that LAICH had contacted another person using Yahoo Instant Messenger, identified as Andrew VINYARD, and attempted to solicit VINYARD for sex.

23.     LAICH reportedly was posing as a female named "Jen," and stated "I like to have my kid watch as I fuck," saying he had a "5 year-old daughter named Katie".  VINYARD stated that LAICH provided his home address and phone number to him as 43100 Twelve Oaks Crescent, 6011 in Novi, Michigan . . . . LAICH, posing as "Jen", apparently advised VINYARD that he would be contacted by her boyfriend, named JAMES, in regards to setting up a meeting with VINYARD and the child for sex.  VINYARD advised that "James" then contacted him by phone, where the two discussed having a sexual encounter with Jen, James and VINYARD.

24.     During [a] meeting, it was also learned that on March 4, 2005, Novi Police Department . . . contacted LAICH by phone in regards to the above complaint.  When asked, LAICH stated that the reason for his being contacted by the police was because he was online in a chat room and he had made some inappropriate comments.  LAICH explained that he . . . was online acting like a woman.  During a conversation with a man who lived near Detroit, LAICH stated that he liked to have sex with his daughter.  LAICH added that his daughter was a fictitious person and that he has no children.  LAICH further stated that he knew that he had crossed

23

the line and that he was sorry.  Detective Lauria asked LAICH where he was when he made these comments.  LAICH replied "Memphis" [.]

. . . .

32.    Additional information obtained from four public databases reveals that James LAICH lives at 43100 12 Oaks Crescent Drive, Apartment #6011, Novi, Michigan 48377. . . .

33.    Because of the following information, there is probable cause to believe that evidence of violations of 18 U.S.C. §§ 2252 and 2252A are located at the SUBJECT PREMISES and within a computer and related peripherals, and computer media found at the SUBJECT PREMISES. . . . LAICH contacted both MANCOS and VINYARD in regards to soliciting them for sexual activity with himself and what he represented as a child, and that LAICH was using Yahoo Instant Messenger account name "playthangnyc18" when he transmitted child pornographic images to MANCOS. . . .

           . . . .

    (C)    LAICH contacted MANCOS in the same manner as VINYARD using Yahoo Instant Messenger, and transmitted child pornographic images to MANCOS

           . . . .

    (D)    Information obtained from Yahoo, Inc. for screen name "playthangnyc18" revealed that it was registered to "Mr. James LAICH, 30 Hickory Lane, Waterford, Michigan 48327."   Other screen names and email addresses connected to the account include intlman_99@yahoo.com, playthangnyc18, jen21finnyc, and jplaich@aol.com.  It should be noted that James LAICH listed on his present rental application contract that his previous address was 30 Hickory Lane, Waterford, Michigan. . . .

           . . . .

    (F)    Information obtained from the Road Runner cable company, which is the cable internet service provider to LAICH's residence, verified that LAICH has been a customer since December 29, 2004, [sic] is 43100 Oaks Crescent Drive, unit #6011, Novi, Michigan.

    (G)    LAICH's apartment manager gave [sic] verbal statement to SA Buloushi that LAICH gave her permission to enter his apartment to feed his cat while she was traveling on several occasions.  While she was in LAICH's apartment

24

she observed a desk top computer in the guest bedroom on several occasions, the most recent one having been on 05/24/2005.

Moreover, by considering the recklessly omitted information, the Court takes notice that Yahoo! has provided evidence which suggests that Laich did not log into any of his email accounts under any of his screen names (including playthangnyc18) on February 13, 2005. Although the proffered evidence presents a very close question, the Court is satisfied that even with only these remaining allegations, Buloushi's affidavit contained a sufficiency of information upon which to justify a search of Laich's home in Novi.  In particular, the Court is persuaded by the following: (1) Mancos' representation that he received the child pornographic images while chatting online with Yahoo! user playthangnyc18; (2) the fact that this Yahoo! screen name was registered to Laich's former home address in Waterford; (3) the Government's ability to link the Waterford location to Laich's current home in Novi where he kept a computer and had internet access as early as December 29, 2004; (4) an acknowledgment by Laich that he had engaged in a similar chat with Andrew Vinyard during the same time frame; and (5) Laich's willingness to disclose his current home address during the Vinyard chat. When evaluating this evidence under the totality of the circumstances standard, the Court concludes that there is a fair probability that a search of Laich's home in Novi could yield evidence of a crime.

Laich argues strenuously that the search warrant affidavit included no IP login data or any other information which specifically connects his home computer to the illicit chats.  However, the Sixth Circuit has held that although IP information would be helpful, such records are not "an indispensable prerequisite to obtaining a search warrant in a case involving Internet-based child

25

pornography." *U.S. v. Terry* , 522 F.3d 645, 649 (6th Cir. 2008).[13] Even assuming that Laich had transmitted the allegedly illicit pictures to Mancos while traveling on business and using a laptop computer, the Court believes it is reasonable to conclude that such a computer would be stored at his home.  In 2002, the Sixth Circuit noted that "[a]lthough innocent explanations for some or all of these facts may exist, this possibility does not render the officers' determination of probable cause invalid." *U.S. v. Martin*, 289 F.3d 392, 400 (6th Cir. 2002).  Because the search warrant affidavit here would support a finding of probable cause - even without the affiant's material misstatements - Laich's motion to suppress the remaining evidence is denied.

III.

For the reasons that have been stated above, Laich's motion to suppress the evidence which was seized as a result of the illegal search of his laptop is granted. On the other hand, Laich's motion (filed pursuant to *Franks v. Delaware, supra*) which, if granted, would suppress the evidence that had been obtained as a result of the warrant to search his home in Novi is denied.

In light of this ruling by the Court, a pre-trial conference is to be held on January 26, 2010 at 1:00 p.m.  Jury trial is scheduled to commence on January 28, 2010.


IT IS SO ORDERED.

Dated:  January 20, 2010                              S/Julian Abele Cook, Jr.
        Detroit, Michigan                             JULIAN ABELE COOK, JR.
                                                      United States District Court Judge

---

[13]In *Terry,* the Sixth Circuit determined that there was a sufficient nexus between the defendant's alleged illegal activity and his home, noting that (1) the evidence showed that a screen name - which was registered to him at his home - sent two-email messages at 2:30 in the morning, and (2) the defendant had a computer at home through which he accessed the account used to send the messages.

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on January 20, 2010.

s/ Kay Doaks
Case Manager